# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NICHOLAS J. CRISMALE,
    Plaintiff,

    v.

KAREN REILLY,
    Defendant.[1]

No. 3:13-cv-00470 (JAM)

## RULING GRANTING MOTION FOR SUMMARY JUDGMENT

On a chilly November evening in 2012, plaintiff Nicholas Crismale was detained outside in his boat yard for over an hour by defendant Karen Reilly, a Connecticut Environmental Conservation Police ("EnCon Police") officer who was investigating a complaint that plaintiff had illegally harvested shellfish in Long Island Sound. Thereafter, plaintiff brought this case under 42 U.S.C. § 1983, claiming that defendant violated his Fourth Amendment right to be free from unreasonable seizure. Plaintiff claims that what started as a lawful, limited investigative detention ripened into an unlawful *de facto* arrest without probable cause. While I understand plaintiff's frustration with the conduct of law enforcement authorities that evening, I conclude that a reasonable officer would not have known or believed that plaintiff's detention was unconstitutional under the circumstances. Accordingly, I grant defendant's motion for summary judgment on the ground that she is entitled to qualified immunity.

## Background

The following facts are undisputed or, where disputed, are stated in the light most

---

[1] The Clerk is directed to modify the case caption as used herein to reflect the withdrawal of a former plaintiff and the correct spelling of defendant's last name.

favorable to plaintiff.[2] Plaintiff is a fisherman who, along with his business partner Jonathan

McGuire, owns Mid-State Shellfish, LLC, a licensed commercial shellfish harvester in

Connecticut. Under Connecticut law, Mid-State Shellfish and other licensed shellfish harvesters

may only harvest shellfish in Long Island Sound in their assigned leased lots. *See* Conn. Gen.

Stat. § 26-192c. The Connecticut Department of Agriculture's Bureau of Aquaculture ("BA") is

responsible for licensing and regulating these shellfish harvesters, *see id.*, while the EnCon

Police have statutory authority to enforce the shellfish laws and regulations, to "inspect . . . all

boats . . . used in the production and preparation of shellfish," and to "without warrant, arrest any

person for any violation of any [law or regulation regarding the harvesting of shellfish]," *see id.*

and Conn. Gen. Stat. § 26-6(a)-(b).

On November 19, 2012, the BA received the latest in a series of complaints that the

Mighty Maxx, a boat owned by Mid-State Shellfish and operated by plaintiff, was illegally

harvesting shellfish off its assigned lots in open waters. To investigate the complaint, the BA

sent a BA analyst to the dock where the Mighty Maxx was located, and the BA also asked the

EnCon Police to dispatch an officer to meet the analyst. It was expected that the BA analyst and

the EnCon Police officer would together review the boat's GPS records in order to determine

where the boat had been harvesting shellfish that day. The EnCon Police dispatched defendant to

---

[2] In assessing the factual record, I do not consider a letter written by Jonathan McGuire and addressed to the former Commissioner of the Connecticut Department of Energy and Environmental Protection that plaintiff has submitted in opposition to this summary judgment motion. *See* Doc. # 31-3 at 51-55. As defendant correctly argues, this unsworn document is insufficient to refute facts properly supported by other competent evidence. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (noting that "unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment"); *United States v. All Right, Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996) ("[T]he submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court."). Moreover, although McGuire was initially a co-plaintiff in this case, he withdrew his action, and plaintiff's counsel stipulated that McGuire would not offer any evidence in this case. *See* Doc. # 19; 23; and 34 at 13. In reliance on this stipulation, defendant declined to depose McGuire, and defendant justifiably relied on the representation of plaintiff's counsel that any evidence from McGuire would not be offered in this case.

meet the BA analyst, but unbeknownst to defendant and for reasons unclear from the record, the BA analyst did not coordinate with the EnCon Police. Instead, the analyst arranged directly with plaintiff to meet at the dock at 3:00 p.m. and she inspected the Mighty Maxx's GPS records on her own.

Later, shortly before 5:00 p.m., defendant arrived at the premises by the dock, which is located behind a factory and was quite dark by that hour of the day. Instead of meeting the BA analyst as she expected, defendant encountered McGuire. Clad in her police uniform, defendant identified herself and stated that she was looking for plaintiff. Defendant explained that she was investigating allegations that the Mighty Maxx was harvesting shellfish off its assigned lots and she asked McGuire for identification. McGuire became agitated and first walked away, but when defendant renewed her request, he handed defendant his driver's license. According to defendant, McGuire was generally uncooperative in response to basic questions, although he did, at defendant's request, call plaintiff to ask him to return to the dock. Plaintiff, who had just left the dock recently, returned to the dock around 5:00 p.m.

When plaintiff arrived at the dock, defendant told him that she was there to meet an individual from the BA and to inspect the Mighty Maxx's GPS as part of an investigation.[3] Curiously, plaintiff did not tell defendant that a BA analyst had already been to the docks and inspected the boat's GPS records; instead, he laughed and said that he was sick of being harassed by state environmental officials. Defendant took plaintiff's driver's license and told plaintiff and McGuire to stand in front of the illuminated headlights of her police vehicle while she verified

---

[3] Plaintiff testified that defendant "explained to me that they were tired of the complaints about me being off the lot and that she had seen me off the lot that day and that's why she was there." Doc. # 31-3 at 6. Defendant disputes this, and states that, although she was aware of and had investigated prior complaints regarding Mid-State Shellfish, she had never observed the Mighty Maxx harvesting shellfish. Defendant claims that she only told defendant that she was investigating a complaint that the BA received earlier that day. This factual dispute is not material to the resolution of this summary judgment motion.

both men's identification and conducted her investigation.

The situation became more confrontational as defendant tried to contact the BA, call for backup, and control the situation at the dock. Defendant claims that McGuire became "very agitated and aggressive," and that he "began walking towards me in an aggressive manner and then returned to [the area in front of the headlights] after I directed him to do so." Doc. # 26-10 at 4, ¶ 18. Defendant repeatedly attempted to contact the BA, to no avail as it was now past regular working hours. McGuire yelled at defendant every time she went back to her vehicle to try to contact the BA. Defendant also called for EnCon backup, believing that she "could [not] safely conduct the investigation or pat down two agitated males" without the assistance of another EnCon officer. *Id.* Despite plaintiff's and McGuire's requests to go inside and sit in their office, defendant demanded that plaintiff and McGuire remain outdoors on the dock standing in front of her vehicle's headlights throughout this process. At some point, defendant requested that plaintiff and McGuire remove their hands from their pockets and she asked them if they had any weapons on them. When the men attempted to leave, defendant said, "If you move, I'll arrest you for interfering in an investigation." Doc. # 31-3 at 26.

Eventually, the backup EnCon officer, who had been delayed travelling through rush hour traffic, arrived at the dock. Once the other officer arrived, plaintiff let the officers check the boat's GPS system. Inspection of the GPS system took between five to ten minutes and did not reveal any wrongdoing. Defendant returned the driver's licenses she had taken from plaintiff and McGuire, and both officers left the dock. The entire duration of plaintiff's encounter with defendant—from plaintiff's arrival at the dock to defendant's departure—lasted over one hour.[4]

---

[4] The precise duration of plaintiff's encounter with defendant is not entirely clear. Defendant claims that the encounter lasted less than an hour, and credible evidence indicates that she may well be right. *See* Doc. # 34-2 at ¶¶ 7-10. But plaintiff testifies that the encounter was over an hour long. Viewing the evidence in the light most favorable to plaintiff as the nonmoving party, I assume for purposes of this motion that the encounter was over an

Subsequently, plaintiff initiated this action under 42 U.S.C. § 1983, claiming that defendant violated his Fourth Amendment right to be free from unreasonable seizure on that November evening.[5] Defendant has moved for summary judgment.

### Discussion

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Gr., LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

---

hour.
    [5] Plaintiff initially raised a claim regarding the warrantless search of the boat, but defendant insisted that she had consent to search the boat; there is no need for me to resolve this issue, because plaintiff abandoned this part of his Fourth Amendment claim at oral argument.

818 (1982). The Supreme Court has recently explained that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083-84 (2011)). In this manner, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (quoting *al-Kidd*, 131 S. Ct. at 2085).

The legal question before me in this case is the permissible scope and duration of an investigative detention. It is well established that a police officer may, consistent with the Fourth Amendment, briefly detain someone for investigative purposes when the officer has reasonable and articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Bailey*, 743 F.3d 322, 331-32 (2d Cir. 2014). These *Terry*-type "investigative detentions are 'seizures' under the Fourth Amendment," *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992), and the scope and duration of such detentions must not be too intrusive, *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (citing *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)).

An initially permissible investigative detention may become an unlawful arrest if the scope and duration of the detention is unreasonable. *Bailey*, 743 F.3d at 336. Here, both parties agree that plaintiff was seized within the meaning of the Fourth Amendment, and that his initial seizure was lawful as a *Terry*-type investigative detention. The parties' only dispute concerns whether this encounter evolved into a *de facto* arrest (for which probable cause would have been required) because it was too long and too intrusive, as plaintiff argues, or whether it remained a proper limited investigative stop throughout, as defendant contends.

"In assessing whether a detention is too long or too intrusive to be justified as an investigative stop, courts properly 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Bailey*, 743 F.3d at 336 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). More generally, the Second Circuit has identified a number of factors relevant to whether there has been a *de facto* arrest, including:

> "[the] amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

*Vargas*, 369 F.3d at 101 (quoting *Perea*, 986 F.2d at 645).

Plaintiff's *de facto* arrest claim is based principally on the duration of his detention, which was over an hour long. While the Supreme Court has declined to establish a bright-line rule for the permissible duration of an investigative *Terry*-type detention, it is clear that a valid detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality). The crux of the duration inquiry is "whether the police diligently pursue[d] their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983). In *Place*, the Supreme Court declined to approve a detention where law enforcement failed to act with sufficient urgency to investigate once a suspect had been detained. *Id.* There, the police had detained a suspect's luggage for ninety minutes while awaiting the arrival of a narcotics detection dog, but the police had ample advance notice of the suspect's arrival and easily could have arranged for a dog to be present when the suspect and his luggage arrived. *Id.* at 708-10. The Supreme Court found that the police's failure to act diligently had unnecessarily exacerbated the intrusion on the suspect's Fourth Amendment interests, invaliding the detention. *Id.* at 709.

7

By contrast, in cases where law enforcement officers have conducted their investigations without needless delay, numerous courts have found investigative detentions of fairly substantial length—anywhere from thirty minutes to nearly three hours—to be constitutionally reasonable. *See, e.g.*, *Glover*, 957 F.2d at 1013 (approximately 30-minute detention reasonable "[g]iven the officer's diligence in pursuing their investigation"); *United States v. Donnelly*, 475 F.3d 946, 951-54 (8th Cir. 2007) (80-minute detention principally awaiting arrival of drug-detecting canine not unlawful where record did not show that police officers "exercised suboptimal diligence" or were "dilatory" in investigation); *United States v. Maltais*, 403 F.3d 550, 557-58 (8th Cir. 2005) (detention of nearly three hours reasonable where law enforcement had difficulty obtaining a drug detecting dog due to "the early morning hour and the remote location" of suspect); *United States v. Sullivan*, 903 F.2d 1093, 1097-98 (7th Cir. 1990) (45-minute detention permissible under the circumstances); *Sakoc v. Carlson*, No. 5:11-cv-290, 2012 WL 3929904, at *9 (D. Vt. Sept. 10, 2012) (35- minute detention "objectively reasonable" for qualified immunity purposes and "did not violate the Fourth Amendment"); *United States v. $60,020.00 U.S. Currency*, No. 08-cv-6286, 2011 WL 4720741, at *8 (W.D.N.Y. Sept. 12, 2011) (delay of "ninety minutes or so" was reasonable in view of diligent and "immediate" efforts of law enforcement); *see also Gilles v. Repicky*, 511 F.3d 239, 246 (2d Cir. 2007) (continued detention of suspect for approximately two-and-a-half hours not permissible after initial inquiry "considerably dissipated" the initial basis for suspicion).

In view of this precedent, I conclude that the qualified immunity doctrine warrants a grant of summary judgment in defendant's favor. To begin with, I cannot say that this detention—lasting some period of time over an hour—was *per se* unreasonable, because the Supreme Court has declined to establish any fixed outer time limit for a permissible investigative

detention. Moreover, many courts have approved as constitutionally reasonable or upheld claims of qualified immunity in cases involving investigative detentions of similar or even longer durations. Most importantly, there is no indication that defendant was dilatory or that she purposefully delayed her investigation for any reasons unrelated to completing what she had been dispatched to the dock to do while ensuring her personal safety when confronted with unforeseen circumstances.

Defendant encountered an unexpected situation—being alone at the dock after dark with two men, one of whom was aggressive and both of whom were uncooperative—and in this environment, she took active steps in furtherance of her investigation: verifying the identification of both men, repeatedly attempting to contact the BA, keeping the agitated men in sight, and calling for backup when she felt that it was necessary to safely conduct her investigation. Factors outside defendant's control substantially lengthened the duration of her investigation and, consequently, the duration of plaintiff's detention. First, the backup EnCon officer who was dispatched to meet her was stuck in rush hour traffic. Second, defendant received virtually no cooperation from plaintiff until the backup EnCon officer arrived. Plaintiff easily could have sped up the process by informing defendant that the BA analyst had already inspected the boat's GPS unit or by simply taking defendant to the boat and showing her the GPS unit. Plaintiff was certainly not required to cooperate with the investigation, but his refusal to do so is a factor in determining the reasonableness of the length of the detention. *See, e.g.*, *Sharpe*, 470 U.S. at 687-88 (duration of stop not unreasonable "when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains"). Ultimately, plaintiff's failure to adduce any evidence that defendant purposefully delayed his detention for any improper or imprudent purpose precludes a finding that the duration of the detention was objectively

unreasonable.[6]

The unfortunate encounter at the dock that November evening might easily have been avoided by better coordination and communication between the EnCon Police and the BA. But my role here is not to decide whether defendant and other state actors made the wisest or most sound choices in conducting their investigation. The question before me is solely whether an objectively reasonable police officer would have known that she was violating clearly established Fourth Amendment law by detaining plaintiff for over one hour in the face of unanticipated obstacles to her investigation. Because my answer to that question is "no," I conclude that defendant is entitled to the protection of qualified immunity.

Defendant's motion for summary judgment is GRANTED.

The Clerk is directed to close this case.

It is so ordered.

Dated at Bridgeport this 29th day of July 2014.

/s/_____
Jeffrey Alker Meyer
United States District Judge

---

[6] Nor could I conclude that any other aspect of this investigative detention was objectively unreasonable due to the overall level of intrusiveness. There is no evidence that there was any physical contact. Defendant did not place plaintiff in handcuffs or draw her firearm. Defendant did restrain plaintiff's movement in that she verbally required him to stay in one location—in front of the illuminated vehicle headlights—but this type of restraint is well within the bounds of a permissible *Terry* detention. *See, e.g.*, *United States v. Tehrani*, 49 F.3d 54, 61-62 (2d Cir. 1995) (taking suspect to small, private office "that he was not free to leave" was reasonable part of "lawful investigative detention").